COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Huff and Athey
Argued at Norfolk, Virginia

PUBLISHED

LARRY DORNELL PALMER

v.      Record No. 1294-18-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
NOVEMBER 26, 2019

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Glenn R. Croshaw, Judge

Richard C. Clark, Senior Assistant Public Defender, for appellant.

Craig W. Stallard, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Appellant Larry Dornell Palmer was convicted in a bench trial of aggravated malicious

wounding. On appeal, he argues that the trial court erred when it permitted the victim,

Antoinette Felton, to invoke the Fifth Amendment's protections against self-incrimination and

when it thereby admitted into evidence the transcript of her preliminary hearing testimony. He

also argues that the trial court erred in finding the evidence sufficient to convict him of

aggravated malicious wounding.

I. BACKGROUND[1]

On May 1, 2018, Palmer was tried in a bench trial in the Circuit Court of the City of

Virginia Beach. Palmer was charged with one count of malicious wounding, one count of

abduction, and one count of aggravated malicious wounding. Before trial, the court granted the

---

[1] "In accordance with established principles of appellate review, we state the facts in the
light most favorable to the Commonwealth, the prevailing party in the trial court." Riner v.
Commonwealth, 268 Va. 296, 303 (2004).

Commonwealth's motion to *nolle prosequi* the malicious wounding charge, and the trial proceeded on the remaining charges.

The Commonwealth called Antoinette Felton, the victim and Palmer's wife, as its first witness. Before taking the stand, Felton stated, "Judge, I plead the Fifth. I plead the Fifth." Despite her declaration, Felton took the stand and was sworn in as a witness. Because of her marriage to Palmer, the trial court granted the Commonwealth's motion for Felton to be declared an adverse witness. In response to questioning by the attorney for the Commonwealth, Felton introduced herself and testified that she had been married to Palmer for a year. When asked to direct her attention to the date of the incident, Felton repeatedly stated, "I plead the Fifth." The prosecutor then stated:

> Well, Judge, I would love for her to answer my questions; but I
> don't know if I in good faith really can say that she doesn't have an
> opportunity to invoke that right, I will tell the court, for a number
> of different reasons. I would just like to complete the record. This
> individual, Mrs. Felton -- she does have pending felony charges in
> Virginia Beach for child abuse, slash, neglect. Those are pending
> with Ms. Sadler, who is present in the courtroom.
> Ms. Cunningham is also present from the City Attorney's office.
> They are both here to observe her testimony today. I also think it's
> possible that based on her testimony here today, it could give rise
> to other charges given that she has testified previously; so I don't
> know if I can really object to her pleading the Fifth Amendment at
> this point.[2]

Palmer's attorney objected to Felton pleading the Fifth if the purpose was "a way to have her declared unavailable as a witness and try to use the transcript from the preliminary hearing." The trial judge overruled the objection. He stated, "It is clear to me that she's in legal peril. Both existing and potentially, her testimony might invoke other legal peril; and, accordingly, I

---

[2] The prosecutor also proffered that there were other potential legal issues that might arise for Felton if she were to testify, including potential "misdemeanor charges for filing a false police report."

think that's perfectly appropriate; so I am going to recognize that the witness has invoked the Fifth Amendment of the U.S. Constitution."

After Felton was excused from the courtroom, the Commonwealth asked that she be declared unavailable to testify based on her invocation of the Fifth Amendment. Palmer's attorney objected, arguing that Felton was not "unavailable" and that she should not be permitted to take the Fifth because Felton's child abuse/neglect charges were unrelated to the facts surrounding Palmer's attack on Felton. The trial court overruled the objection and deemed Felton unavailable to testify.

The Commonwealth then sought to introduce the transcript of Felton's testimony from Palmer's preliminary hearing based on Felton's unavailability to testify at trial. Palmer's counsel again objected, relying on Sapp v. Commonwealth, 263 Va. 415 (2002), which he argued stood for the proposition that "where a person is making a generalized statement that they want to take the Fifth but there has been no determination if she is really in any kind of danger," transcripts of prior testimony cannot be introduced. The trial court overruled the objection, finding that Felton was "not expressing vague notions of discomfort or some sort of reluctance" and admitted the transcript.

The transcript from the preliminary hearing showed that Felton testified that on the evening of March 6, 2017 or the early morning of March 7, 2017, she and Palmer got into an argument in which Palmer accused her of having an affair with a man named Keith Scott. She testified that Scott was in the apartment earlier that day and that he had a gun with him while present although he never displayed it. Felton admitted to drinking during the evening but denied being intoxicated.

Felton testified that after their argument, Palmer left the apartment for an hour or two. When he returned, he kicked down the door, and she could smell alcohol on his breath. She testified

that he pinned her down and cut her fourteen times. She also testified that he was crying during the attack. She stated that, at one point when she "was cut and screaming," their young daughter walked in and begged Palmer not to kill or hurt her mother. Felton testified that Palmer told their daughter that, if she left to get help, he would kill Felton.

Felton testified that Palmer eventually stopped attacking her. She stated, "When he seen that it was blood everywhere, I think he got scared and ran out and just left me there bleeding." After the incident, Felton was unable to walk for three weeks, and she had scarring as a result of her injuries.

After the transcript of Felton's testimony was admitted, the Commonwealth introduced additional trial witnesses. Alyse Tolbert-Quinonts, a neighbor of Palmer and Felton, testified that on March 7, 2017, she heard a knock on her door. She opened it to find Felton "on the floor in the hallway" where she was "crunched in a ball and crying and bleeding." Tolbert-Quinonts stated that Felton "looked like she was cut." She called 9-1-1 for help.

Jared Smolinski, a forensic specialist, testified that he arrived at Felton's and Palmer's residence at 5:01 a.m. on March 7, 2017. He stated that he collected two knives "at about the tree line right off the road," which was "several hundred yards" from the apartment building. Photographs of the knives, the apartment building, the apartment's interior, the victim, and the victim's clothing – all photographed by Smolinski – were admitted into evidence. Felton's medical records from the night of the attack were also admitted into evidence.

Master Police Officer Scott J. Conklin, an officer of the canine unit of the Virginia Beach Police Department, testified that as he was traveling to the scene of the crime, he heard a description of the suspect on the radio. Conklin stated that, when he arrived at the scene, his police canine was able to "locate a track" which eventually led them to Palmer, who was then

- 4 -

taken into custody.  Conklin also testified that he and his canine found the two knives that were later photographed by Smolinski.

After the Commonwealth rested, Palmer's counsel moved to strike the evidence, in part because he claimed that the evidence showed that Palmer's actions were triggered by the argument he had with Felton about her allegedly having an affair with Scott and by Scott's being in their apartment.  Palmer's counsel argued that this evidence, coupled with the testimony that Palmer was crying when he committed the attack, showed that the wounding was committed in the heat of passion and not with malice.  The trial court denied the motion to strike, and Palmer's attorney declined to put on evidence.  Palmer then renewed his motion to strike.  After hearing additional argument, the trial court granted the motion to strike the abduction charge but found Palmer guilty of aggravated malicious wounding.

## II. ANALYSIS

### Felton's Fifth Amendment Plea

In his first assignment of error, Palmer argues, "The trial court erred in allowing Antoinette Felton, the victim in the case, to plead the Fifth Amendment and refuse to testify at trial and erred in allowing the Commonwealth to introduce the transcript of her prior sworn testimony from the preliminary hearing in place of live testimony at trial."  With respect to the first component of Palmer's assignment of error, he argues that the trial court did not properly determine if Felton could plead the Fifth because "the trial court did not inquire of the witness what the actual reason was for her assertion."

The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself."[3]  This constitutional "privilege protects against real dangers [of prosecution], not remote and speculative possibilities."  N. Am.

---

[3] The Virginia Constitution also provides this protection.  Va. Const., art. 1, § 8.

Mortg. Inv'rs v. Pomponio, 219 Va. 914, 919 (1979) (quoting Zicarelli v. New Jersey State Comm'n of Investigation, 406 U.S. 472, 92 (1972)). A witness' bare assertion that an answer will incriminate him is insufficient to sustain the privilege. Hoffman v. United States, 341 U.S. 479, 486 (1951). Rather, "[i]t is for the court to say whether his silence is justified." Id.; see also Cunningham v. Commonwealth, 2 Va. App. 358, 362 (1986) ("The question whether the privilege is properly invoked is one for the trial court.").

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

Hoffman, 341 U.S. at 486-87. We will not reverse the decision to allow a witness to invoke the Fifth Amendment unless it is "'*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) *cannot possibly* have such tendency' to incriminate." Id. at 488 (quoting Temple v. Commonwealth, 75 Va. 892, 898 (1881) (emphasis in original)).

In this case, the Commonwealth proffered that Felton had pending charges against her for felony child abuse/neglect. Because the charges were already pending, they certainly represented "real dangers, not remote and speculative possibilities." See N. Am. Mortg. Inv'rs, 219 Va. at 919 (quoting Zicarelli, 406 U.S. at 478). The Commonwealth also proffered that the attorney for the Commonwealth who was prosecuting Felton on the pending child abuse/neglect charge and an individual from the City's Attorney's Office were present in the courtroom "to observe her testimony." This proffer and the presence of these individuals indicated that the prosecutor anticipated that Felton's testimony about the night of the attack could well assist the Commonwealth in a prosecution of Felton for the child abuse/neglect charge. Furthermore,

giving the required deference to the trial judge's "personal perception of the peculiarities of the case," we certainly cannot say that it is "perfectly clear" that Felton's Fifth Amendment claim was mistaken and that her testimony could not possibly have a tendency to incriminate her. See Hoffman, 341 U.S. at 486-88.[4] Therefore, the trial court did not err in permitting Felton to assert her Fifth Amendment right against self-incrimination.

The second component of Palmer's assignment of error challenges the introduction of the transcript of Felton's preliminary hearing testimony because he claims she was not unavailable. He argues that "[w]ithout a legitimate reason to invoke the privilege, the facts in this case are similar to the facts in Sapp v. Commonwealth." In Sapp v. Commonwealth, 263 Va. 415, 424 (2002), the Supreme Court held that the trial court erred when it declared two witnesses unavailable and permitted the introduction of their prior testimony where one witness stated that he refused to testify out of fear and the other cited his fear and memory loss. In so holding, the

_____

[4] Allowing a witness to make a blanket assertion of the privilege is generally not permitted. Cunningham v. Commonwealth, 2 Va. App. 358, 361 (1986). Instead, "[o]nce a witness asserts his fifth amendment right, some investigative questioning must be allowed." Id. "It does not necessarily follow, however, that the failure of the trial court to follow such a course in this case constituted reversible error." Worrells v. Commonwealth, 212 Va. 270, 272 (1971) (finding no error where the defense attorney did not proffer to the trial court the specific questions he intended to pose to the witness). While there *may* have been some questions which Felton could have answered beyond her name and relationship with Palmer that would not have called for an incriminating answer, appellant did not seek to perform any "investigative questioning." Instead, he argued that *nothing* about Felton's testimony was incriminating. Because it is conceivable that some things about the nature of Felton's turbulent relationship with Palmer could have assisted the attorney for the Commonwealth with the prosecution of Felton for the pending child abuse/ neglect charges, permitting Felton to take the Fifth Amendment was in keeping with the principle "that the guarantee against testimonial compulsion must be liberally construed." In re Grand Jury Proceedings, 562 F.2d 334, 335 (5th Cir. 1977) (holding that the witness, who was "nationally reputed to be a leader of organized crime" could invoke the Fifth Amendment although he made no *in camera* showing of his specific fears of incrimination and the prosecutors disavowed their belief that he had taken criminal action relating to the case). In this situation, requiring Felton to say more would require her "to prove the hazard in the sense in which a claim is usually required to be established in court" and "compel[] [her] to surrender the very protection which the privilege is designed to guarantee." Hoffman, 341 U.S. at 486.

Court stated, "Vague assertions of discomfort or generalized statements of fear or concern cannot rise to the same level of significance as evidence of specific threats." Id. at 425. Palmer contends that Felton's unsupported plea against self-incrimination is similar to the "vague assertions of discomfort and generalized statements of fear" made by the witnesses in Sapp.

We find that Sapp is distinguishable on several grounds. First, unlike the witnesses in Sapp, Felton asserted the Fifth Amendment as a basis for her refusal to testify. Second, as discussed *supra*, Felton's fears were not vague or generalized. She was facing pending charges for child abuse/neglect – not the remote possibility that she might be indicted for some uncertain crime. In addition, there was a prosecutor from the Office of the Commonwealth's Attorney in the courtroom present for the specific purpose of listening to her testimony, strongly suggesting that Felton's testimony about the night of the attack could be used to incriminate her in the child abuse/neglect case.

"The law is firmly established in Virginia that a declarant is unavailable if the declarant invokes the Fifth Amendment privilege to remain silent." Boney v. Commonwealth, 16 Va. App. 638, 643 (1993); see also Lilly v. Commonwealth, 255 Va. 558, 573 (1998), rev'd on other grounds sub nom. Lilly v. Virginia, 527 U.S. 116 (1999). Because the trial court did not err in allowing Felton to plead the Fifth Amendment, Felton was unavailable to testify at Palmer's trial and the introduction of her testimony from the preliminary hearing was not error.[5]

### Sufficiency of the Evidence for Aggravated Malicious Wounding

In his second assignment of error, Palmer argues the evidence was insufficient to support his conviction for aggravated malicious wounding. He contends that the evidence shows he acted in the heat of passion when he wounded Felton, negating the malice element necessary for

---

[5] Palmer does not, on appeal, challenge the admissibility of the transcript of Felton's preliminary hearing testimony for any reason other than the determination that Felton was unavailable to testify at trial.

a malicious wounding conviction.[6] He argues that he and Felton were fighting over her alleged affair with Scott and that he did not have time for his "passions to cool as only an hour or two had passed since the initial argument." He also claims that Felton's testimony about how Palmer was crying during the attack is evidence that it was committed in the heat of passion.

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner v. Commonwealth, 268 Va. 296, 330 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." Canipe v. Commonwealth, 25 Va. App. 629, 642 (1997). "Implied malice may be inferred from 'conduct likely to cause death or great bodily harm, wilfully or purposefully undertaken.'" Id. (quoting Essex v. Commonwealth, 228 Va. 273, 281 (1984)). Malice may also "be inferred 'from the deliberate use of a deadly weapon.'" Doss v.

---

[6] Code § 18.2-51.2(A) provides in pertinent part: "If any person maliciously . . . stabs . . . any other person . . . with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment."

Commonwealth, 23 Va. App. 679, 686 (1996) (quoting Perricllia v. Commonwealth, 229 Va. 85, 91 (1985)).

Although Palmer argues he was acting in the heat of passion, the record in this case is replete with evidence that Palmer acted with malice. Palmer claims that his passions were ignited by his argument with Felton over her alleged relationship with Scott. However, "[w]ords alone, no matter how insulting, are never sufficient to constitute heat of passion." Rhodes v. Commonwealth, 41 Va. App. 195, 201 (2003). After the argument, Palmer left the apartment. When he returned an hour or two later, he had two knives, which he then used to attack and stab Felton fourteen times. Use of those deadly weapons would certainly allow the factfinder to infer malice. In addition, when Palmer's and Felton's young daughter walked into the room, Palmer showed his malicious intent when he told his daughter that he would kill Felton if his daughter left to get help. Given the totality of this evidence, we certainly cannot say that no rational factfinder could have found that Palmer acted with the requisite malice to support his conviction for aggravated malicious wounding.

## III. Conclusion

The trial court did not err in permitting Felton to invoke the Fifth Amendment where it was proffered that Felton had charges pending against her for felony child abuse/neglect and where individuals involved in possibly prosecuting her on those charges were present in the courtroom for the purpose of observing her testimony. Under these circumstances, and allocating the trial judge the deference required by the proper standard of review, we cannot say that it was "perfectly clear" that Felton's testimony about the event could not possibly have incriminated her. Moreover, because the trial court did not err in permitting Felton to plead the Fifth Amendment, it also did not err in deeming her unavailable to testify at trial and, consequently, in admitting the transcript of her testimony from the preliminary hearing.

The trial court also did not err in finding the evidence sufficient to convict Palmer of aggravated malicious wounding. After Palmer and Felton had an argument, Palmer left the apartment and returned an hour or two later armed with two knives which he used to stab Felton fourteen times, injuring her to the point that she was unable to walk for three weeks. In addition to using deadly weapons in the attack, from which use the trial court could infer malice, Palmer also demonstrated his malicious intent when he told the couple's young daughter that he would kill Felton if his daughter sought help for her mother. Given the totality of this evidence, we certainly cannot say that no rational factfinder could have found the necessary malice to convict Palmer of aggravated malicious wounding.

For all of these reasons, we affirm the trial court's conviction of Palmer.

<u>Affirmed.</u>